## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTOPHER ODLE, Individually and on behalf of all others similarly situated, and MATTHEW PFEIL, on behalf of all others Similarly situated. , <br><br> Plaintiffs, <br><br> vs. <br><br> GAMESTOP CORP. d/b/a GAMESTOP, INC.,,, <br><br> Defendant. | )<br>)<br>)<br>)<br>)   **Case No. 24-CV-1417-DWD**<br>)<br>)<br>)<br>)<br>) |

### MEMORANDUM & ORDER

**DUGAN, District Judge:**

This matter is before the Court on Defendant GameStop Corporation's ("GameStop") Motion to Dismiss Under Rule 12(b)(6) (as to Plaintiffs Christopher Odle and Matthew Pfeil) or, in the Alternative, to Compel Arbitration (as to Plaintiff Matthew Pfeil only). (Doc. 28). Plaintiff Christopher Odle has responded (Doc. 34), and Plaintiff Matthew Pfeil has responded (Doc. 36).

### I.    BACKGROUND

#### A. Allegations

Video game sales are a multi-billion dollar per year business, this includes sales of new games, pre-owned games, and used games. (Doc. 24 ¶¶ 17-18). In the video game industry and resale market, a game in its "original" manufacturers packaging that is still sealed is worth more than a game that has been opened." (Doc. 24 ¶ 20). Accordingly, customers are willing to pay a premium price for new and/or unopened games versus a

used or opened or pre-owned game. (Doc. 24 ¶ 21). Defendant is aware of this and prices "new" games differently than "used" and "pre-owned" games. (Doc. 24 ¶ 22).

Defendant has a company-wide policy that limits or prohibits placing unopened video games on the floor of retail stores because of a belief that such games are easily portable and may be stolen. (Doc. 24 ¶ 24). To address this risk, Defendant has a company-wide policy that provides that video game discs are to be kept behind the counter to prevent theft. (Doc. 24 ¶ 25). As a result, almost every "new" game that GameStop sells has actually been opened. (Doc. 24 ¶ 26). Defendant does this despite knowing that unopened games in the original manufacturers sealed packaging are worth more in the video game market than opened games. (Doc. 24 ¶ 28). Nonetheless, Defendant charges its customers a premium price for games that Defendant has opened. (Doc. 24 ¶ 29).

Plaintiffs Christopher Odle ("Odle") and Matthew Pfeil ("Pfeil") are consumers who bought video games from Defendant between 2021 and 2023. Odle, an Illinois citizen, purchased games from Defendant, at a store located in St. Clair County, Illinois, on September 9, 2021 and December 13, 2022. (Doc. 24 ¶¶ 4-5). At the time of purchase, Odle intended to buy new video games and chose to buy new video games, as opposed to used video games. At the time of each purchase, Odle selected the games he wanted to purchase, but the "game packaging he selected" did not contain the actual disc or cartridge that contains the game software. (Doc. 24 ¶ 7). Odle then went to the counter and informed the sales associate which games he wanted to purchase and specified he wanted to "purchase the games 'new,' as opposed to pre-owned or used." (Doc. 24 ¶ 8).

2

The sales associate sold Odle the games, and they were represented as being "new" games. (Doc. 24 ¶ 10). The prices for the games were between $50.00 and $60.00 per game, which is generally the accepted price for a "new" version of a game. (Doc. 24 ¶ 10).

Pfeil, a Missouri citizen, purchased a video game from a store located in St. Louis County, Missouri on October 12, 2023. (Doc. 24 ¶ 11). Like Odle, at the time of purchase, Pfeil chose to buy a new video game. (Doc. 24 ¶ 12). Pfeil "selected the game he wished to buy, but the game packaging he selected did not contain the actual disc that contains the game software." (doc. 24 ¶ 13). Pfeil went to the GameStop counter and informed the sales associate that he wished to "purchase the game 'new,' as opposed to pre-owned or used." (Doc. 24 ¶ 14). The sales associate sold Pfeil the game and represented it as being "new." (Doc. 24 ¶ 15). selected a new game, indicated he wanted to purchase a new game, and the game he purchased was represented as being new. (Doc. 24 ¶¶ 12-15). The price Pfeil paid was within the range of the generally accepted price for a "new" version of the game. (Doc. 24 ¶ 16).

Plaintiffs contend that customers who purchase games sold, marked, or marketed as "new" games, when those games have already been opened, are purchasing a product that is not worth the premium price they are paying for it, comes with less return options, and is worth less on the resale market. Based on this, Odle brings two claims on behalf of himself and a putative class of consumers: (1) a claim under Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2 and (2) a claim under the Illinois Uniform Deceptive Trade Practices Act ("UDTPA") 815 ILCS

510/1 *et seq.* Pfeil brings a claim on behalf of himself and a putative class of consumers under the Missouri Merchandising Practices Act, o. Rev. Stat. § 407.020 *et seq.*

**B. Alleged Arbitration Agreement as to Pfeil**

Pfeil enrolled in what was then called GameStop PowerUp Rewards Program on April 9, 2016. (Doc. 28-1 ¶ 9). At the time of enrollment, the GameStop PowerUp Rewards Program did not contain an arbitration clause or a class action waiver. The GameStop PowerUp Rewards Program was replaced with and is now called the GameStop Pro Program. (*Id*. ¶ 9).

Under the Pro Program, for an annual fee, members receive benefits from Defendant including a monthly five-dollar reward, 10% extra trade-in credits, 5% off certain categories of products, and other exclusive deals and products available only to Pro Members. (*Id*.). The Pro Program is subject to the Pro Terms Conditions (the "Pro Terms"). Beginning on January 23, 2020, the Pro Terms were revised to include a mandatory arbitration provision and class action waiver. (*Id*. ¶ 6).

On October 12, 2023, at approximately 4:20 PM, Pfeil purchased an automatic renewal for his membership in the Pro Program in-store while purchasing a game. (Doc. 28 ¶ 10). At that time, the only way a customer could renew a Pro membership in-store and agree to automatically renew their yearly membership was by affirmatively clicking "I Agree" on the point-of-sale pin pad while being presented with the following message:

> Terms & Conditions. By clicking "I Agree", you agree that your membership will automatically continue until cancelled and authorize us to charge the annual membership fee (currently $25) to your payment method each year on or near your enrollment date. Note the annual membership fee may increase on renewal. To cancel your subscription at

any time, visit your GameStop Pro account at GameStop.com, email care@gamestop.com, or call 1-800-883-8895.

The following is a picture of the referenced point-of-sale pin pad:



As part of his renewal, Pfeil received a total discount of $27.50 on his purchase. (Doc. 28-1 ¶ 12). Pfeil would not have received this benefit if he were not a Pro member. Doc. 28-1 ¶ 12).

Pfeil contends that he was never informed about, and did not agree to, the revised Pro Terms. (Doc. 36 ¶ 6-11). Defendant disagrees. Defendant contends that a copy of the terms and conditions were emailed to Pfeil. (Doc. 28 ¶ 11). Specifically, Defendant indicates that, *after* selecting "I agree" on the pin pad, at approximately 4:25, Pfeil received an email confirming that he successfully enrolled in a Pro membership. (Doc. 28 ¶ 11). According to Defendant, Pfeil opened the email around 4:29 PM. The email

confirmed that Pfeil had elected to enroll in the Auto-renewal program. The email further provided:

> For more information on your GameStop Pro Membership or the GameStop Pro Program and associated benefits (exclusions apply) please visit the Terms which includes the <u>terms</u> and conditions on the Auto-renewal Program, and our FAQ page.

The word "terms" was underlined and provided the hyperlink for the terms and conditions. The following is a copy of the confirmation email allegedly sent to Pfeil:



The Pro Terms linked to the email consisted of 11 pages. The first page, in bold lettering, indicated that the terms contain a mandatory arbitration and class action waiver. The Pro Terms also include a choice-of-law clause providing that "any Dispute you may have with GameStop, will be governed by federal law and the Federal Arbitration Act as to

arbitration issues and the law of the State of Texas for all other issues…" (Doc. 28-5, pg. 7).

The Pro Terms also included a cancellation provision that provided Pro Members could cancel their Membership and receive a full refund "within two(s) days of purchase of the Membership *if the Member has not used any of the Pro benefits*…" (Doc. 28-5, pg. 4).

> Pro Members can potentially increase their annual value by utilizing the additional benefits (such as the above-listed 5% extra off discount on certain categories, 2% back in rewards, annual digital access to Game Informer magazine, and 10% extra trade-in credit) stated in these Terms.
>
> **GameStop Pro Membership Management**
>
> A Pro Member may cancel their Membership and receive a full refund within two (2) days of purchase of the Membership if the Member has not used any of the Pro benefits, including earning points or discounts, subject to certain conditions. Upon returning the Pro Membership materials, the Pro Membership will be downgraded to the free GameStop Account. A Member may cancel his or her Pro Membership at any time (without refund) by notifying Guest Care by mail, email, or telephone (see the Contact Us section below). GameStop, in its sole discretion, reserves the right to cancel an individual Pro Membership by refunding the purchase price. Cancellation will result in the loss of all of Member's accumulated points (bonus or otherwise).
>
> In the event a Pro Member does not pay to renew their Membership after the 1-year period, the Member's Account will be downgraded to the free GameStop Account.

(Doc. 28-5, pg. 4). As noted above, however, Pfeifer used Pro benefits on the day he renewed, before receiving the email linking to the Pro Terms, and thus, under the terms, he could not have cancelled his membership for a full discount.

After receiving the email, Pfeil made various purchases at GameStop and received benefits from his Pro membership. (Doc. 28 ¶¶12-14).

## II.     MOTION TO COMPEL ARBITRATION

### A.  Legal Standard

The Federal Arbitration Act ("FAA") mandates that courts enforce valid, written arbitration agreements. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002) (citing 9 U.S.C. § 2). This mandate reflects a federal policy that favors arbitration and "places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  Arbitration should be compelled under the FAA

when "three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018) (citing 9 U.S.C. §§ 3–4).

Courts deciding motions to compel arbitration apply a summary judgment standard under Federal Rule of Civil Procedure 56. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). "A district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if no genuine dispute of material fact exists as to the formation of the agreement." *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 618 (7th Cir. 2024). The party seeking to compel arbitration "bears the initial burden to show that an arbitration agreement exists." *Id.*

## B. Analysis

Pfeil challenges the existence of an arbitration agreement with GameStop. Thus, before determining whether the arbitration provision applies to Pfeil's claims or whether that very question itself is delegated to the arbitrator, the Court must determine if a valid contract incorporating the arbitration clause was formed. GameStop argues Texas law applies per the choice-of-law clause in the Pro Terms. Pfeil has not responded to this contention and, throughout his brief, cites alternatively to Illinois and Texas law.

### 1. Choice-of-Law

GameStop's reliance on the Texas choice-of-law clause presupposes a valid contract and is premature when formation is contested. See e.g., *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, No. 07 C 1707, 2008 WL 687224, at *3 (N.D. Ill. Mar. 7, 2008) (choice-of-law clauses apply only after contract formation is established); *Sosa v. Onfido,*

*Inc.,* No. 1:20 CV 04247, 2021 WL 38141, at *2 (N.D. Ill. Jan. 5, 2021), aff'd, 8 F.4th 631 (7th Cir. 2021) (when contract formation is in issue, it would be inappropriate to apply a choice-of-law provision because "the antecedent question of whether that document applies to the parties [has not been resolved]").

In diversity cases, federal courts apply the forum state's choice-of-law rules – here, Illinois. *Wachovia Sec., LLC v. Banco Panamericano, Inc.,* 674 F.3d 743 (7th Cir. 2012) (as to which State's substantive law controls, a federal court sitting in diversity applies the choice-of-law rules of the forum state). Illinois follows the "most significant relationship test" for deciding among conflicting laws. *Purcell & Wardrope Chartered v. Hertz Corp.,* 530 N.E.2d 994, 1001 (Ill. App. Ct. 1988). "The factors to be considered in determining which state has the most significant relationship to a contract claim are: the place of negotiation, the place of execution or contracting, the place of performance, the location of the subject matter of the contract, the domicile, residence, place of incorporation, and the business of the parties." *Id.* at 1001.

Pfeil renewed his membership in Missouri, where the transaction was negotiated, executed, and performed, and where the membership benefits were used. (Doc. 28 ¶ 10). The subject matter—the Pro Program membership—is tied to Pfeil's Missouri purchases. Pfeil resides in Missouri, while GameStop is incorporated in Delaware with its principal place of business in Texas. (Doc. 24 ¶¶ 2-3). Thus, four factors favor Missouri, outweighing GameStop's ties to Texas and Delaware. Accordingly, Missouri law governs contract formation.

9

## 2. Contract Formation Under Missouri Law

Having resolved the threshold choice-of-law question, the Court turns to whether Pfeil agreed to arbitrate claims with GameStop. To prove a valid and enforceable contract, Missouri law requires offer, acceptance, and consideration. *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. 2014). An arbitration agreement "constitutes a waiver of the right to present claims to a judicial tribunal." *Holm v. Menard, Inc.*, 618 S.W.3d 669 (Mo. Ct. App. 2021) (applying Missouri law). As such, the terms must be "unequivocal, plain, and clear." *Id.* citing *Malan Realty Investors, Inc. v. Harris*, 953 S.W.2d 624, 626 (Mo. banc 1997).

The key question is whether Pfeil's October 12, 2023 in-store renewal bound him to the Pro Terms, including the arbitration clause.[1] As previously noted, Pfeil renewed his membership in-person (paying the renewal fee in exchange for Pro Term benefits). At the time of renewal, Pfeil clicked "I Agree" on a point-of-sale pin pad. The pin pad only referenced Pfeil's agreement to enroll in the program, cancellation options, and authorization for GameStop to automatically charge a renewal fee annually. There was no indication that the Pro Program included any additional terms, let alone that Pfeil was agreeing to additional terms. After the sale, Pfeil received an email confirming his enrollment and indicating that, if he wanted additional information about the Pro

---

[1] The Court notes that the Pro Terms in effect as of June 27, 2023, allow GameStop to unilaterally modify the terms without notice. (Doc. 28-5, pg. 6). Pfeil enrolled in an earlier version of GameStop's rewards program in 2016, before the 2020 revision adding an arbitration clause. (Doc. 28-1 ¶ 9). GameStop has not produced the 2016 terms and conditions. Thus, there is no evidence that the 2016 terms provided for unilateral modification without notice. Without evidence, the Court cannot conclude the Pfeil assented to future modifications without notice. Moreover, under Missouri law, if there was a modification clause, and if that clause allowed GameStop to unilaterally "amend the agreement retroactively," GameStop's "promise to arbitrate [would be] illusory and [would not be] consideration." *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 777 (Mo. 2014). Without the 2016 terms, the Court cannot assess these issues.

Program's benefits, he could review the terms, available by clicking a hyperlink in the email. Because Pfeil did not cancel his membership and continued to incur benefits from the Pro Program, GameStop contends he assented to the Pro Terms, including the arbitration clause.

Although not a perfect match, the transaction at issue bears some resemblance to online "clickwrap" and "browsewrap" agreements.[2] When assessing these types of agreements, Missouri courts "apply traditional principles of contract law and focus on whether the plaintiff had reasonable notice of and manifested assent to the online agreement." *Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009). Notice comes in two forms: actual notice and inquiry notice. Actual notice "occurs when the user is actually aware of the terms of use, most commonly after clicking on a hyperlink and reviewing them." *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021). Inquiry notice "depends on whether the website puts a reasonably prudent user on inquiry notice of the terms." *Id.* (quoting *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)). A critical factor in assessing notice is "the website's overall design and content, including whether the existence of the relevant terms are reasonably conspicuous to the user." *Id.* (internal quotations and citation removed). The relevant inquiry is whether the user had reasonable notice of the terms and "manifested assent" by clicking a box or button (clickwrap agreements) or through continued use of the website (browsewrap

---

[2] Online agreements typically categorized as "clickwrap" or "browsewrap" agreements. A clickwrap website is a site where users manifest assent by clicking on a box or a button (e.g., í Agree"). *Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009). A browsewrap website is a site where users do not need to click to accept the terms, but the site indicates "in some fashion that use of the site constitutes acceptance of its terms." *Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009).

agreements). Courts will not enforce agreements "where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the site, where users are unlikely to see it." *Hennessey v. Kohl's Corp.*, 571 F. Supp. 3d 1060, 1070 (E.D. Mo. 2021). However, if the website contains "an explicit textual notice" of the terms, courts will generally find that a user was on inquiry notice. *Id.*

Here, the point-of-sale pin pad transaction resembles an online clickwrap contract. The pin pad mentioned only payment and renewal; there was no reference to any additional terms or any indication that Pfeil was agreeing to terms that would restrict his rights. (Doc. 28-8). Under these circumstances, no reasonable consumer would infer that clicking "I Agree" bound them to undisclosed arbitration. Because there was neither actual notice nor inquiry notice, clicking "I Agree" did not bind Pfeil to any undisclosed terms, including the agreement to arbitrate.

The next question is whether GameStop's post-sale email provided sufficient notice of the Pro Terms, such that Pfeil's continued use of the Pro Program constituted assent to those terms. As to this question, in addition to the authority previously discussed, the Court considers authority addressing the validity of "shrinkwrap" agreements. "In a 'shrinkwrap agreement,' a customer pays first, later receiving a good with the seller's full terms of sale and an opportunity to return the purchase." *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 852 (8th Cir. 2022) (discussing shrinkwrap agreements generally). See also e.g., *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997) (post-purchase terms may bind a party if notice is adequate and rejection is possible); *Hobbs v. Tamko Bldg. Prods., Inc.*, 479 S.W.3d 147, 150 (Mo. Ct. App. 2015) (distinguishing

*Gateway*, finding no contract, despite continued use of product where consumers did not receive notice of proposed post-purchase terms). The "core logic of a shrinkwrap agreement is that the vendor may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance." *Ballou v. Asset Mktg. Servs.*, LLC, 46 F.4th 844, 852 (8th Cir. 2022).

In Missouri, an offer may be accepted by the offeree's conduct or failure to act *if* (1) the offeree received sufficient notice of the terms upon which the goods or services are offered and (2) the offeree is given a reasonable opportunity to reject the offered goods or services. *See Citibank (S. Dakota), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005); *Pride v. Lewis*, 179 S.W.3d 375, 380 (Mo. Ct. App. 2005); *Moore v. Kuehn,* 602 S.W.2d 713, 718 (Mo. App. E.D. 1980).

Here, Pfeil denies ever seeing the Pro Terms, so actual notice was not present. Accordingly, the Court reviews the post-sale email to determine if it was sufficient to impart inquiry notice. As previously noted, the post-sale email congratulated Pfeil for "successfully" enrolling in the Pro Program and stated:

> For more information on your GameStop Pro Membership or the GameStop Pro Program and associated benefits (exclusions apply), please visit the Terms, which include the terms and conditions on the Auto-renewal Program, and our FAQ page…

(Doc. 28-11). This phrasing suggests that reviewing the terms is optional and is for the purpose of understanding the *benefits* associated with the Pro Plan. There is no indication that the linked terms restrict Pfeil's rights, or that continued use would constitute assent to those terms. Additionally, when Pfeil completed the in-store pin pad transaction, the

screen provided information about the Pro Program's "Terms and Conditions," which indicated that the terms included nothing more than agreeing to the auto renewal process. The post-sale email gives no indication that the referenced terms are different than or in addition to the terms Pfeil reviewed in-store. Thus, nothing would have alerted Pfeil to the fact that, by remaining in the Pro Program, he was agreeing to new terms and that he should click on the link to determine what those terms were.

Inquiry notice demands more; the existence of the relevant terms must be reasonably conspicuous to the user. *Hennessey v. Kohl's Corp.*, 571 F. Supp. 3d 1060 (E.D. Mo. 2021). This distinguishes the case from enforceable shrinkwrap scenarios, where the consumer is clearly informed that acceptance of the goods or services will bind the consumer to additional terms, or online agreements where the user is clearly informed that continued use of the site or clicking "I agree" binds the user to the company's hyperlinked terms. For these reasons, the Court concludes that the email's vague reference to terms is insufficient to put a reasonable consumer on notice of the arbitration provision that GameStop seeks to enforce. Without actual or inquiry notice, Pfeil's continued participation in the Pro Program cannot be deemed assent to the arbitration clause.

Additionally, the terms did not provide a real opportunity to opt out. According to the hyperlinked terms, Pfeil could cancel his membership and receive a full refund "within two (2) days of purchase of the Membership if [he had] not used any of the Pro benefits, including earning points or discounts." (Doc. 28-5, pg. 4). Pfeil received no information regarding the additional terms linked in the post-sale email during his in-

14

store purchase *and* used a discount before the email arrived, rendering the two-day cancellation window illusory. As such, Pfeil did not have a "reasonable opportunity to reject" GameStop's post-sale offer. See *Citibank (S. Dakota), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo. Ct. App. 2005) (acceptance through conduct requires a reasonable opportunity to object); *Moore v. Kuehn,* 602 S.W.2d 713, 718 (Mo.App. E.D. 1980)(stating that an offer may be accepted through conduct "[w]here the offeree with reasonable opportunity to reject offered goods or services takes the benefit of them under circumstances which would indicate to a reasonable man that they were offered with the expectation of compensation.").

The Court therefore finds that there was no agreement to arbitrate, and the Motion to Compel Arbitration will be **DENIED**.

### III.    MOTION TO DISMISS

#### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops

short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Twombly, 550 U.S. at 557 (internal quotation marks omitted)).

When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and ... draw all reasonable inferences in favor of the plaintiff." Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co., 20 F.4th 303, 307 (7th Cir. 2021) (citation omitted). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Def. Sec. Co. v. First Mercury Ins. Co., 803 F.3d 327, 334 (7th Cir. 2015) (citations and internal quotation marks omitted).

### B. Pleading Standard

The parties disagree as to whether the Amended Complaint alleges practices that are deceptive versus unfair. Odle's ICFA claim may be based on either (or both), but the two categories have different pleading standards. Vanzant v. Hill's Pet Nutrition, Inc., 934 F.3d 730, 738 (7th Cir. 2019). "If the claim rests on allegations of deceptive conduct, then Rule 9(b) applies, and the plaintiff must plead with particularity the circumstances constituting fraud." Id. (citing Camasta, 761 F.3d at 737). "Specifically, the complaint must identify the 'who, what, when, where, and how' of the alleged fraud." Id.

Odle argues that the heightened pleading standard does not apply to her ICFA claim because she alleges GameStop's conduct was unfair. But the Amended Complaint asserts that GameStop's conduct is both deceptive and unfair. "The applicable pleading standard does not turn on a formalistic invocation of the word 'unfair.' It depends instead on the plaintiff's factual allegations." Kahn v. Walmart Inc., 107 F.4th 585 (7th Cir. 2024). If

16

an unfair practices claim is based on "a course of fraudulent conduct," such as intentionally misleading consumers, Rule 9(b)'s heightened pleading applies. *Kahn,* 107 F. 4th at 601-02. See also *Haywood v. Massage Envy Franchising, LLC, 887 F.3d 329, 333-34 (7th Cir. 2018).*

Here, Odle's ICFA claim is premised on the allegation that GameStop intentionally misled customers by representing that its products were "new," even though the products had been opened. Thus, even though the Amended Complaint periodically uses the word "unfair," Rule 9(b)'s heightened pleading standard applies. See *Camasta,* 761 F.3d at 737 ("Simply adding language of 'unfairness' instead of 'misrepresentation' does not alter the fact that [their] allegations are grounded in fraud under ICFA.").

Odle's UDTPA claim and Pfeil's MMPA claim are premised on the same allegedly deceptive misrepresentation. Accordingly, they are also subject to Rule 9(b)'s heightened pleading standard. See *Goldman v. Tapestry, Inc.*, 501 F. Supp. 3d 662 (E.D. Mo. 2020) ("The Eastern and Western Districts of Missouri have consistently held that Rule 9(b) applies to MMPA cases."); *Haywood v. Massage Envy Franchising, LLC, 887 F.3d 329, 333-34 (7th Cir. 2018);* (Plaintiff's ICFA and MMPA claims alleging unfair practices "still sound[ed] in fraud because it reli[ed] upon the same baseline allegation that [Defendant] intentionally misled consumers"); *Craggs v. Fast Lane Car Wash & Lube, LLC*, 402 F. Supp. 3d 605, 611 (W.D. Mo. 2019) (noting that "numerous district judges in Missouri have held that Rule 9(b) applies to MMPA claims, particularly those that ... are fraud-like in that they are based on misrepresentations and omissions" (citing cases)); *Marvellous Day Elec. (S.Z.) Co. v. Ace Hardware Corp.*, No. 11 C 8756, 2013 WL 4565382 (N.D. Ill. Aug. 27, 2013)

(heightened pleading standard of Rule 9(b) applied to UDTPA claims sounding in fraud).[3]

## C. Analysis

### 1. ICFA

Generally, the ICFA protects consumers against unfair or deceptive acts or practices, including but not limited to the use of deception, fraud, false pretense, false promise, misrepresentation, or concealment, or the omission of any material fact. 815 Ill. Comp. Stat. § 505/2. To state a claim under the ICFA, a plaintiff must plead facts demonstrating that: (1) the defendant committed a deceptive or unfair act; (2) the defendant intended that others rely on the deception; (3) the act occurred in the course of trade or commerce; and (4) the act caused actual damages. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (citing *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019)). Deception is defined as "[a] statement [that] creates a likelihood of deception or has the capacity to deceive." *People ex. rel Hartigan v. Knecht Servs., Inc.*, 216 Ill.App.3d 843, 857, 575 N.E.2d 1378, 1387, 159 Ill.Dec.

---

[3] Odle claims the Amended Complaint alleges GameStop acted unfairly in violation of the ICFA (Pfeil's briefing merely adopts Odle's argument). Courts consider three factors in determining whether conduct is unfair as proscribed by the ICFA: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002 (7th Cir. 2018) (quotations omitted). While Odle asserts in his opposition brief that GameStop violated Illinois public policy, the Amended Complaint contains no such allegations. The Amended Complaint periodically uses the word "unfair" and, with respect to Pfeil's claim, describes the conduct as "unconscionable, unfair, and deceptive." These statements, however, are nothing more than "bare assertion[s] of unfairness." This is insufficient to state a consumer fraud claim premised on unfairness. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 775 N.E.2d 951 (2002). See also *Ware v. Samsung Elecs. Americas, Inc.*, No. 18-CV-00886, 2020 WL 1322852, at *2 (N.D. Ill. Mar. 20, 2020) ("Even under Rule 8's liberal pleading standards, bare allegations that Samsung's conduct violates public policy or is oppressive are insufficient—[plaintiffs] must describe how the unfair practice is oppressive or violates public policy," otherwise, their "complaint fails to state a cause of action under the ICFA.") (internal citation and quotation omitted); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) (plaintiffs cannot amend their complaint with statements made in their opposition brief). Thus, to the extent that Plaintiffs intended to bring separate claims premised on unfairness, the allegations are insufficient to state a claim.

18

318 (Ill. App. 1991); *see also Bober v. Glaxo Wellcome Plc.,* 246 F.3d 934, 938 (7th Cir. 2001). A reasonable consumer standard is used to determine if deception has occurred. *Beardsall v. CVS Pharmacy, Inc.,* 953 F.3d 969, 972 (7th Cir. 2020). This standard requires a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Bell v. Publix Super Markets, Inc.,* 982 F.3d 468, 474-75 (7th Cir. 2020) (internal citations omitted).

How a reasonable consumer would interpret an ambiguous food label is typically a question of fact that should not be decided on the pleadings. *See id.* at 483. But "a court may dismiss the complaint if the challenged statement was not misleading as a matter of law." *Ibarrola v. Kind, LLC,* 83 F. Supp. 3d 751, 756 (N.D. Ill. 2015) (citing *Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 940 (7th Cir. 2001)). Where plaintiffs base deceptive advertising claims on "fanciful interpretations of labels or other advertising", dismissal on the pleadings may be appropriate. *Bell v. Publix Super Markets, Inc.,* 982 F.3d 468, 477 (7th Cir. 2020) (collecting cases). *See also Bober v. Glaxo Wellcome PLC,* 246 F.3d 934, 940 (7th Cir. 2011) (dismissing a claim of deceptive advertising noting the allegedly deceptive statement was "completely true", that the product's label "eliminate[d] any possibility of deception, " and that the products label "[could] only be read" in a nondeceptive way).

Notably, even a true statement can be misleading – if it creates a false impression. See *Bell,* 982 F.3d at 479; *Beardsall,* 953 F.3d at 973 ("A label is deceptive if it is likely to mislead a reasonable consumer in a material respect, even if it is not literally false."); *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 761–62 (7th Cir. 2014) (noting that a deceptive-practices claim under the ICFA "may be satisfied by proof that a statement is

likely to mislead a reasonable consumer, even if the statement is literally true."). However, "the few cases which have found a true statement to be actionable under ICFA typically involve a facially obvious omission or deception as to a material fact." *Oettle v. Walmart, Inc.*, 2022 WL 3584944, at *5 (S.D. Ill. 2022).

Odle's ICFA claim centers on whether GameStop representing a game as "new" deceives a reasonable consumer into believing it is unopened and in its original packaging. Odle alleges he sought "new" games, meaning unowned and unused, as opposed to "pre-owned" or "used." (Doc. 24 ¶¶ 6, 8). This framing indicates that his primary expectation was a lack of prior use – a condition GameStop's products satisfied. Yet, he contends that "new" also promises an unopened state, an interpretation the Court must evaluate against the reasonable consumer standard.[4]

Odle's Amended Complaint undermines his own argument. He alleges that consumers pay a premium for "new and/or unopened games" over "used," "opened," or "pre-owned" ones. (Doc. 24 ¶ 21). By pairing "new" and "unopened" as distinct qualities, he suggests they are not synonymous – otherwise, the distinction would be redundant. This concession refutes the claim that "new" inherently conveys an unopened condition. Furthermore, his assertion that unopened games hold greater value reflects a subjective preference, not an objective representation by GameStop. A reasonable

---

[4] The Amended Complaint's assertion that consumers expect "new" games to be unopened (Doc. 24 ¶ 19) is a conclusory statement, not a factual allegation the Court must accept. See e.g., *Wach v. Prairie Farms Dairy, Inc*., No. 21 C 2191, 2022 WL 1591715, at *3 (N.D. Ill. May 19, 2022) ("[Plaintiff's] allegations about consumer expectations – i.e. that a reasonable consumer would expect a product labeled 'Premium Vanilla Ice Cream' to contain a non-negligible amount of extracts from vanilla beans or to include real vanilla flavoring—are conclusory statements I need not accept.") (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

consumer would not automatically infer "sealed" from "new" absent explicit cues like
"factory sealed," especially when the product's unused status aligns with the
representation. The Seventh Circuit has rejected such inferential leaps when the
statement is true and no material omission is evident. See *Bober v. Glaxo Wellcome Plc., 246
F.3d 934, 940 (7th Cir. 2001)* (dismissing a claim where the label was 'completely true' and
eliminated any possibility of deception); ." *Bell v. Publix Super Markets, Inc., 982 F.3d 468,
477 (7th Cir. 2020)* (describing unsupported interpretations "fanciful").

Odle's position further unravels when considering GameStop's practices, as
alleged in the Amended Complaint. He notes a "company-wide policy" of opening new
games and storing discs behind the counter to prevent theft, yet still selling them as
"new." (Doc. 24 ¶¶ 24-25). This admits the games were unused despite being opened,
rendering the "new" label literally true. Odle does not claim GameStop concealed this
practice or promised sealed packaging—only that he assumed it. The ICFA, however,
does not redress personal expectations unrooted in a defendant's actual statements. See
*Bober*, 246 F.3d at 940.

Odle's allegations—contrasting "new" with "used," distinguishing it from
"unopened," and acknowledging GameStop's policy—collectively demonstrate that
"new" aligns with its common meaning: unused and unowned. His insistence that it also
means "unopened" lacks support beyond his own assumptions, failing to show that a
significant portion of reasonable consumers would share his interpretation. See *Bell*, 982
F.3d at 474-75. No likelihood of deception arises from a true statement about prior use
when no additional misrepresentation about packaging is made.

21

Absent plausible allegations of a misleading representation or material omission,

Odle does not state a claim under the ICFA. Accordingly, GameStop's Motion to Dismiss

the ICFA claim will be **GRANTED**.

### 2.  UDTPA

The UDTPA codifies the Illinois common law of unfair competition. *See*

*generally Nat'l Football League Props., Inc. v. Consumer Enters., Inc.,* 26 Ill.App.3d 814, 327

N.E.2d 242, 247 (Ill.App.Ct.), cert. denied, 423 U.S. 1018, 96 S.Ct. 454, 46 L.Ed.2d 390

(1975) (detailing the historical foundations of the UDTPA). To state a claim under the

UDTPA, a plaintiff must allege a false, misleading, or deceptive representation made with

the intent that the consumer rely on it.  815 Ill. Comp. Stat. 510/2; *Lynch Ford, Inc. v. Ford*

*Motor Co.,* 957 F. Supp. 142, 147 (N.D. Ill. 1997). Odle's UDTPA claim hinges on the same

assertion as his ICFA claim: that GameStop represented a game as "new" despite it not

being in its original packaging. Since a deceptive misrepresentation is a required element

of both the UDTPA and ICFA claims, Odle's UDTPA claim fails for the same reason as

his  ICFA  claim—namely,  the  absence  of  a  sufficiently  alleged  deceptive

misrepresentation.

Additionally, Odle's UDTPA claim is deficient because the statute limits plaintiffs

to seeking injunctive relief, which necessitates an allegation of ongoing or imminent

future harm. See *Greenberg v. United Airlines*, 563 N.E.2d 1031 (Ill. App. Ct. 1990);

*Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 909 N.E.2d 848

(Ill. App. Ct. 2009). Here, GameStop allegedly harmed Odle through a deceptive

statement about the game's condition. However, now that Odle is aware of GameStop's sales practices, he is unlikely to suffer future harm from them. See *Kahn v. Walmart Inc.*, 107 F.4th 585, 606 (7th Cir. 2024); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 741 (7th Cir. 2014).

### 3. MMPA

The MMPA prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020(1). To state a claim under the MMPA a plaintiff must plead that he "(1) purchased merchandise ... from [the defendant]; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the [MMPA]." Goldsmith v. Lee Enter., Inc., 57 F.4th 608, 615 (8th Cir. 2023) (emphasis added, quotation omitted); Hennessey v. The Gap, Inc., 86 F.4th 823 (8th Cir. 2023).

Additionally, Pfeil must establish (a) that he acted as a reasonable consumer would in light of all circumstances; (b) that the method, act, or practice declared unlawful would cause a reasonable person to enter into the transaction that resulted in damages; and (c) individual damages with sufficiently definitive and objective evidence to allow the loss to be calculated with a reasonable degree of certainty. *Bell v. Annie's, Inc.*, 673 F. Supp. 3d 993, 998 (E.D. Mo. 2023). Courts have held that dismissal of an MMPA claim is warranted when a plaintiff fails to show the likelihood that a reasonable consumer would

be deceived. See *Guerrero v. PIM Brands, Inc.*, No. 23 CV 690 RLW, 2024 WL 3338843, at *2 (E.D. Mo. July 9, 2024)

Pfeil, like Odle, asserts that GameStop engaged in "deceptive and unfair trade practices" in violation of the MMPA. His allegations mirror those raised in Odle's claim under the ICFA. For the same reasons articulated in the Court's analysis of Odle's ICFA claim, Pfeil fails to sufficiently allege a deceptive representation or a material omission by GameStop. Consequently, Pfeil has failed to plausibly alleged that GameStop's conduct would deceive a reasonable consumer, and his claim is subject to dismissal.

## IV.    CONCLUSION

For the reasons set forth herein, GameStop's Motion to Dismiss Under Rule 12(b)(6) or, in the Alternative, to Compel Arbitration (Doc. 28) is **GRANTED** in part and **DENIED** in part. The Motion to Compel Arbitration is **DENIED**. The Motion to Dismiss is **GRANTED**. Plaintiffs' claims, and the First Amended Complaint, are dismissed without prejudice. Plaintiffs have 14 days to file an amended complaint. If they do not do so, dismissal of the Amended Complaint will be converted to dismissal with prejudice and this case will be closed.

**SO ORDERED.**

Dated: March 28, 2025                    /s *David W. Dugan*

_____
DAVID W. DUGAN
United States District Judge